**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ISIAH WILEY,

        Plaintiff,

vs.                                 Case No.:    3:16-cv-717-J-34JBT

OFFICER J.C. NOBLES,

        Defendant.

_____/

## ORDER

### I.    Status

Plaintiff Isiah Wiley, who is now an inmate of the Florida Department of Corrections, initiated this action on June 1, 2016, by filing a pro se Civil Rights Complaint Form. (Doc. 1; Complaint). Wiley then filed several amended complaints until he eventually filed the Third Amended Complaint, which is the operative pleading. (Doc. 14; "TAC"). In the TAC, Wiley brings a single claim under 42 U.S.C. § 1983 against Officer J.C. Nobles of the Jacksonville Sheriff's Office ("JSO"). Specifically, Wiley alleges that Officer Nobles used excessive force while arresting him after he robbed a food mart and led Officer Nobles on a foot chase, in violation of Wiley's right to be free from unreasonable seizures under the Fourth Amendment. TAC at 5, 7.[1] Wiley claims he suffered first, second, and third degree burns as a result of the alleged excessive force. Id. at 7. Wiley also alleges a number of state law claims: battery, negligence, negligent training and supervision, and intentional

_____

[1]    Citations to the page numbers on docket entries refer to the page number designated by CM/ECF.

infliction of emotional distress. Id. at 6, 8-10. As an exhibit to the TAC, Wiley attached a copy of JSO's "Response to Resistance Report" and his own treatment notes from Shands Hospital, both of which contain Wiley's handwritten annotations. (Doc. 14-1;"TAC Ex.").

This cause is before the Court on Defendant's Motion for Final Summary Judgment and Accompanying Memorandum of Law (Doc. 24; Motion), filed on September 8, 2017. Officer Nobles argues that based on the record and the undisputed facts, he did not use excessive force and is entitled to qualified immunity. In support of the Motion, Officer Nobles attached the Arrest and Booking Report (Doc. 25-1; "A&B Report"), his own declaration (Doc. 25-2; "Nobles Decl."), the declaration of Valerie Rao, M.D. (Doc. 25-3; "Rao Decl."), and the declaration of Officer Christopher Scarpinati, JSO's custodian of records for Taser evidence (Doc. 25-4; "Scarpinati Decl."). Officer Nobles also submitted a copy of Wiley's sworn deposition (Doc. 26-1; "Wiley Depo."), additional treatment notes from Shands hospital (Doc. 27-1), and various other exhibits, including photographs of Wiley's injuries (Doc. 28-1). Officer Nobles seeks summary judgment on Wiley's state law claims also, arguing that he is immune from liability pursuant to sections 768.28(9) and 776.085, Florida Statutes. Motion at 18-19. Since Wiley is appearing pro se, the Court advised him of the provisions of Rule 56, Federal Rules of Civil Procedure (Rule(s)), and gave him an opportunity to respond to the Motion. (See Doc. 15; Order Directing Service of Process Upon Defendant; Notice to Plaintiff at 3–4, ¶ 8); (Doc. 29; Summary Judgment Notice). Wiley responded in opposition to the Motion on October 10, 2017. (Doc. 33; Response). Accordingly, this matter is ripe for review.

## II. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[2] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.

---

[2]      Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Facts[3]

On the evening of July 30, 2014, Wiley was out for a walk when he decided to enter Paradise Food Mart at 1750 North Laura Street in Jacksonville, Florida. Wiley Depo. at 66, 76. Wiley knew the woman who was working the cash register that evening, as they used to make casual conversation "about fishing and different things." Id. at 66. When Wiley entered the food mart, the cashier "got suspicious" and immediately went "to go back behind the counter." Id. at 66-67, 76. Wiley does not know why he did what he did next,

---

[3]     Because this case is before the Court on Defendant's Motion, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in the light most favorable to Wiley. See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008); see also Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 822 (11th Cir. 1997) ("For the limited purpose of our analysis of the issue of qualified immunity at the summary judgment stage, we are bound to view the facts in the light most favorable to the plaintiffs."). Additionally, the facts before the Court in this case are mostly undisputed, and any disagreement has been indicated.

but he then jumped behind the counter and forced the money out of the cash register. Id. at 67. After taking the money and a Black-and-Mild cigar, Wiley hopped back over the counter to leave, but the cashier hit the alarm button, causing the front door to lock. See id. Undeterred, Wiley kicked the door open and walked out of the store. Id.

Meanwhile, Officer Nobles was patrolling a nearby area as part of an off-duty assignment. Nobles Decl. at 2 ¶ 4. He was wearing his police uniform and driving an unmarked police vehicle not equipped with lights and sirens. Id. Officer Nobles heard over the radio that the silent alarm had been activated at the Paradise Food Mart. Id. at 3 ¶ 5. Based on his familiarity with the store's owners, Officer Nobles knew they would activate the alarm only "for serious situations." Id.

Hearing no other units responding to the call, Officer Nobles proceeded westbound down 8th Street toward the store. Id. at 3 ¶ 6. Along the way, he "saw a black male running in the opposite direction … about 100 yards from the store." Id. Officer Nobles "thought it was suspicious that a man would be running in blue jeans on [a] warm night in July," but he decided to respond first to the scene of the incident to investigate the alarm. Id. Once he arrived at the store, three people, including the cashier, "began yelling and pointing at the man I had just seen running in the opposite direction on 8th Street. They told me that I had just driven past the man who robbed the store." Id. at 3 ¶ 7. Notably, one of the witnesses told Officer Nobles that the suspect was armed with a knife. Id.[4]

Officer Nobles pulled out of the parking lot and began driving eastbound down 8th Street to find the man he had just seen running. See id. at 3 ¶ 8; see also id. at 14. He

---

[4]     Wiley was not in fact armed with any weapons. See Motion at 2 n.2; Wiley Depo. at 80. However, Wiley does not dispute that a witness told Officer Nobles that he was armed with a knife. See generally Response.

turned his vehicle north onto Main Street to canvass the area between 8th Street and 9th Street. See id. at 3 ¶ 8, 14. Based on past experience, Officer Nobles knew of an alley behind a closed drive-through restaurant that transients are known to frequent, where he thought he might find the robber. Id. at 4 ¶ 9. Officer Nobles was traveling at about 5 miles per hour with his headlights on. See id. at 3 ¶ 8. As he drove past the alley, Officer Nobles saw a man's head pop out from behind a large garbage drum and disappear. Id. Officer Nobles turned around, turned off his headlights, and pulled into the alley, where he spotted Wiley. Id.; Wiley Depo. at 96-98.[5]

By now it was around 10:00 p.m., Wiley Depo. at 74, and the alley was poorly lit, Wiley Depo. at 91, 96; Nobles Decl. at 4 ¶ 10. Officer Nobles got out of his vehicle and positioned himself behind the open driver's side door for his safety. Nobles Decl. at 4 ¶ 10. Officer Nobles drew his handgun and ordered Wiley to get on the ground. Wiley Depo. at 68. According to Wiley, Officer Nobles did not announce that he was a police officer. Id. at 99. Although Officer Nobles was wearing his police uniform,[6] Wiley did not see the uniform right away because Officer Nobles was standing behind the driver's door. Wiley Depo. at 68, 99-100. Nevertheless, Wiley "really felt that [Nobles] was a police officer" and he was under no impression that Officer Nobles was somebody robbing him. Id. at 103-04.

Officer Nobles yelled twice at Wiley to get on the ground. See id. at 68, 100. Wiley did not comply. See id. at 68. On the second or third command, Officer Nobles shouted at

---

[5]    Although not material, there is a slight discrepancy in the parties' aerial depictions of exactly which alley where Officer Nobles encountered Wiley. Compare Nobles Decl. at 14 with Doc. 28-1 at 10. However, both agree that the encounter occurred in an alley formerly used as a drive-through by a now-closed restaurant. Nobles Decl. at 4 ¶ 9; Wiley Depo. at 98.

[6]    The parties ultimately agree that Officer Nobles was in fact wearing his police uniform at the time of the incident. See Wiley Depo. at 114-15; Nobles Decl. at 2, ¶ 4.

Wiley to get on the ground "motherf*cker." Id. at 68, 100. Again, Wiley did not do so. Instead Wiley "took a hit of his cigar," thumped it out, and asked Officer Nobles why he was aiming a gun at his head. Id. at 68, 100. Wiley noticed that between each command, Officer Nobles seemed to duck down into his car as if to look for something. Id. at 69. Wiley feared that Officer Nobles was planning to shoot him and that the officer was looking for a gun to "plant" on him. See id. at 69, 116-17. According to Officer Nobles, he was trying to call for back-up on his radio, but the radio was not working, Nobles Decl. at 4-5, ¶¶ 10-11, which is consistent with Wiley's recollection that he did not hear a radio, Wiley Depo. at 100, 104, 117. Wiley decided that if Officer Nobles ducked inside his car again, he would use that opportunity to make a run for it. Id. at 69, 103.

Officer Nobles gave a fourth command to get on the ground and then ducked inside his car again, at which point Wiley took off running. Id. A foot chase ensued down the alley. Wiley emerged from the alley and made a right turn down the sidewalk in front of two other businesses, Heather's Food Mart and a 24-hour laundry mat. Id. at 109; Doc. 28-1 at 10; Nobles Decl. at 5 ¶ 12, 14. Officer Nobles rounded the corner in hot pursuit. Nobles Decl. at 6 ¶ 12. The area there was better illuminated due to the light coming from the businesses. Wiley Depo. at 110; Nobles Decl. at 5-6 ¶12. Wiley looked back over his shoulder and saw that Officer Nobles was wearing his police uniform, but Wiley kept running. Wiley Depo. at 114-15. Wiley also recalls that he saw Officer Nobles carrying a brown rifle with a shoulder strap, id. at 110, but he never saw Officer Nobles aim the rifle at him, id. at 118, 140.[7] After Wiley caught a glimpse of Officer Nobles in his uniform, he

---

[7]     Officer Nobles denied that he was carrying a rifle with him, and asserts that it would have been impossible for him to both carry his rifle and deploy his taser. Nobles Decl. at 7 ¶ 16. However, for purposes of this Motion, the Court accepts Wiley's testimony that Officer Nobles was carrying a rifle. What the Court need not accept, however, is Wiley's suggested inference that Officer Nobles

took about four or five more steps and then lost consciousness. Id. at 114. Wiley has no recollection of what happened between when he lost consciousness and when he awoke at Shands Hospital later that evening. Id. at 70-72.

Officer Nobles reports that after he rounded the corner by Heather's Food Mart, he pulled within 25 feet of Wiley and fired his Taser. Nobles Decl. at 6 ¶ 12. Officer Nobles deployed the Taser because he feared Wiley had a weapon, given that (1) witnesses reported he had just committed a robbery and (2) one of the witnesses had reported Wiley was armed with a knife. Id. at 6 ¶ 12, see also id. at 3 ¶ 7, 8 ¶ 21. Officer Nobles also deployed the Taser because Wiley "was not going to stop" and he was approaching a residential area. Id. at 6 ¶ 12. Officer Nobles saw the two Taser probes "hit Wiley in the lower area of his back" while Wiley was in mid-stride. Id. at 6 ¶¶ 13-14. After the Taser probes struck Wiley, "his body locked up and he fell [face-down] and slid on the asphalt surface," id. at 6 ¶ 14, which the evidence reflects was "very rough and pebbly," id. at 8 ¶ 20; see also id. at 45. The record, which includes a log of Officer Nobles's Taser activity, shows that Officer Nobles deployed the Taser once for 5 seconds. Id. at 6 ¶ 13; Scarpinati Decl. at 3 ¶ 3.

After Wiley fell to the ground, Officer Nobles ran up to him and handcuffed him "without incident." Nobles Decl. at 6 ¶ 14. Officer Nobles called for a rescue and waited for backup to arrive. Id. A first responder removed the Taser probes from Wiley's back, after which point Officer Nobles was relieved of his duties and he returned to his off-duty

---

shot him with the rifle, which is an inference the record refutes for reasons discussed below. "While this Court must resolve all factual disputes in favor of Plaintiff and accept all reasonable inferences drawn therefrom for purposes of summary judgment, this Court [need] not ignore the facts and accept unreasonable inferences in favor of the Plaintiff." Hudson v. Fla. Dep't of Corr., No. 1:16-CV-00152-MW-GRJ, 2017 WL 2903346, at *4 n.12 (N.D. Fla. May 12, 2017).

assignment. Id. at 6-7 ¶ 15. Officer Nobles states that he "never struck [Wiley] with my hands or an object, nor did I kick him or use any force on him after he was handcuffed." Id. at 7 ¶ 16; see also id. at 7 ¶ 18.

Wiley was transported to Shands Hospital where his injuries were treated and documented. The treatment notes reflect that Wiley sustained lacerations to his face and chin, abrasions to his arms, a "non-displaced mandibular fracture," and a "taser injury." TAC Ex. at 4-8; Doc. 27-1. Photographs of the lacerations and abrasions are included in the record. Doc. 28-1 at 11-17. Wiley's breathing and heart rate were normal, and he was described as "alert and oriented to person, place, and time." TAC Ex. at 6. Overall, Wiley's status was reported as "good." Id. at 8. Nothing in the medical reports suggests that Wiley suffered a gunshot wound or any first, second, or third degree burns. The top of each page of the treatment notes reflects that Wiley was admitted to the hospital on July 30, 2014 – the date of the robbery and tasing – and discharged the next day. Id. Officer Nobles submitted an affidavit from Valerie Rao, M.D., who reviewed the photographs of Wiley's injuries, the hospital notes, and other records. See generally Rao Decl. Dr. Rao states that each of Wiley's injuries was consistent with an unprotected fall against or contact with a rough, hard surface, such as asphalt or concrete. Id. at 3, ¶¶ 4.a-4.f. Moreover, Dr. Rao avers that "[t]here is no evidence of any thermal injury whatsoever. There are absolutely no first, second, or third degree burns on the face or the extremities of Mr. Isiah Wiley. The injuries are not at all life threatening and as such he was medically treated and released soon thereafter." Id. at ¶ 4.g.

Before Wiley left the hospital, he was handcuffed and placed under arrest. See Wiley Depo. at 72, 156. Months later, Wiley entered a plea and was adjudged guilty of

robbery and resisting an officer without violence. Doc. 26-1 at 188-94. Robbery is a second-degree felony, in violation of section 812.13(2)(c), Florida Statutes, and resisting an officer without violence is a first-degree misdemeanor, in violation of section 843.02, Florida Statutes. Wiley has never denied that he robbed the Paradise Food Mart or that he fled Officer Nobles. Additionally, Wiley has never argued that Officer Nobles lacked probable cause to arrest him.

## IV.    Discussion

### A. Section 1983 Excessive Force Claim Against Officer Nobles

In the TAC, Wiley claims that Officer Nobles is liable under § 1983 because he used excessive force during the arrest, in violation of the Fourth, Fifth, and Fourteenth Amendments. TAC at 5. Wiley claims that Officer Nobles "used excessive force in the use of his taser, causing multiple 1st, 2nd, and 3rd degree burns on both arms of the plaintiff," id., and suggests that based on his injuries, Officer Nobles shot him with a rifle or otherwise used excessive force, Wiley Depo. at 70, 90, 138. "In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under the color of state law." See Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001). In response to the excessive force claim, Officer Nobles argues that he did not use excessive force and that he is entitled to summary judgment because he is immune from suit under the doctrine of qualified immunity. See generally Motion.

Although Wiley contends that Officer Nobles violated his Fourth, Fifth, and Fourteenth Amendment rights by using excessive force during the arrest, TAC at 5, claims of excessive force arising from an arrest are analyzed only under the Fourth Amendment's

standard of "objective reasonableness." <u>Graham v. Connor</u>, 490 U.S. 386, 389, 395 (1989). As such, Wiley's invocation of the Fifth Amendment is unavailing. In <u>Graham</u>, the Supreme Court explained:

> <u>all</u> claims that law enforcement officers have used excessive force—deadly or not—in the course of arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

<u>Id.</u> at 395.[8]

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force during the course of a criminal apprehension." <u>Oliver v. Fiorino</u>, 586 F.3d 898, 905 (11th Cir. 2009). However, "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347 (11th Cir. 2002) (citation omitted). Indeed, the Eleventh Circuit recognizes that "the typical arrest involves some force and injury." <u>See</u> <u>Rodriguez v. Farrell</u>, 280 F.3d 1341, 1350 (11th Cir. 2002). "A constitutional violation only occurs when the officer's use of force is 'objectively unreasonable' in light of the totality of the circumstances at the time the force is used." <u>Glover v. Eighth Unknown D.E.A. Agents/Drug Task Force Agents from Birmingham, Ala. Task Force</u>, 225 F. App'x 781, 785-86 (11th Cir. 2007) (citation omitted).

---

[8]     The Fourth Amendment is applicable to the States through the Fourteenth Amendment. <u>Brown v. City of Huntsville, Ala.</u>, 608 F.3d 724, 734 n.15 (11th Cir. 2010) (citations omitted).

In evaluating a claim of excessive force, courts must use a "standard of reasonableness at the moment." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.

> We do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest. The Court's task is only to determine whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense.

Buckley v. Haddock, 292 F. App'x 791, 794 (11th Cir. 2008). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396.

Because "reasonableness" cannot be defined precisely or applied mechanically, the Supreme Court has instructed that:

> its proper application requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.

Id. (bracketed numerals added); see also Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993), modified, 14 F.3d 583 (11th Cir. 1993). A court uses these factors, referred to as the Graham factors, to analyze the reasonableness of an officer's use of force. See Lee v. Ferraro, 284 F.3d 1188, 1198 (11th Cir. 2002). "Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Id. In addition to the Graham

factors, the Eleventh Circuit has also set forth the following considerations for determining if force was reasonable: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Vinyard, 311 F.3d at 1347 (citing Lee, 284 F.3d at 1197-98). Significantly, "an officer will be entitled to qualified immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Vinyard, 311 F.3d at 1346.

The defense of qualified immunity is available to an official sued in his individual capacity but not to one sued in his official capacity. See Fitzgerald v. McDaniel, 833 F.2d 1516, 1520 (11th Cir. 1987). Here the Court concludes that Wiley is suing Officer Nobles only in his individual capacity. Although in the caption of the TAC, Wiley, who is pro se, stated he is suing Officer Nobles "in his personal and official capacity," TAC at 1, he clarified during his deposition that he only intends to sue Officer Nobles in his individual capacity, Wiley Depo. at 147-50. Additionally, while Wiley argues that Officer Nobles is not entitled to qualified immunity based on the facts of this case, he does not suggest that Officer Nobles is sued in his official capacity such that qualified immunity would be unavailable as a matter of law. See generally Response. As such, the Court construes Wiley's pleading as suing Officer Nobles in his individual capacity, and will consider whether Officer Nobles is entitled to the benefit of qualified immunity based on the facts of this case.

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800,

13

818, 102 S. Ct. 2727, 2738, 73 L. Ed.2d 396 (1982)). As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'" <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015); <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1266 (11th Cir. 2003). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." <u>Lee</u>, 284 F.3d at 1200 (quoting <u>Marsh v. Butler County, Ala.</u>, 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).[9]

To be entitled to qualified immunity, an official must first establish that his conduct was within the scope of his discretionary authority. <u>See</u> <u>Webster v. Beary</u>, 228 F. App'x 844, 848 (11th Cir. 2007) (per curiam); <u>Lee</u>, 284 F.3d at 1194. In the instant action, Officer Nobles was plainly acting within his discretionary authority when he arrested Wiley.[10] Accordingly, the burden shifts to Wiley to demonstrate that qualified immunity is not appropriate under the two-prong test established by the Supreme Court in <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed.2d 272 (2001). The first inquiry is, taken in the light most favorable to the non-moving party, "do the facts alleged show the

---

[9]     In determining whether a defendant is entitled to qualified immunity, the court views the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record and then considers "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." <u>Priester v. City of Riviera Beach, Fla.</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000); <u>Scott v. Harris</u>, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 n.8, 167 L. Ed.2d 686 (2007).

[10]     "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority.'" <u>Jones v. City of Atlanta</u>, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam) (quoting <u>Lenz v. Winburn</u>, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. <u>See</u> <u>Crosby v. Monroe Cnty.</u>, 394 F.3d 1328, 1332 (11th Cir. 2004); <u>see also</u> <u>Lee</u>, 284 F.3d at 1194 (finding that "there can be no doubt that [the officer] was acting in his discretionary capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which she was arrested).

officer's conduct violated a constitutional right?" Id.; see also Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513, 153 L. Ed.2d 666 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377, 127 S. Ct. 1769, 1774, 167 L. Ed.2d 686 (2007)). If the Court finds that the plaintiff's version of the facts alleges a violation of a constitutional right, then the next question is whether the right was clearly established at the time of the violation.[11] Hope, 536 U.S. at 739, 127 S. Ct. at 2515; Saucier, 533 U.S. at 201, 121 S. Ct. at 2156; Scott, 550 U.S. at 377, 127 S. Ct. at 1774; Lee, 284 F.3d at 1194.

> [The Eleventh] Circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional. The first method looks at the relevant case law at the time of the violation; the right is clearly established if "a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law." This method does not require that the case law be "materially similar" to the official's conduct; "officials can still be on notice that their conduct violates established law even in novel factual circumstances." But, where the law is stated in broad propositions, "a very high degree of prior factual particularity may be necessary."
>
> The second method looks not at case law, but at the officer's conduct, and inquires whether that conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case-law." This method—termed "obvious clarity,"—is a "narrow exception" to the normal rule that only case law and specific factual scenarios can clearly establish a violation.

Fils v. City of Aventura, 647 F.3d 1272, 1291 (11th Cir. 2011) (citations omitted). With respect to the Fourth Amendment, the Supreme Court has cautioned that:

> [t]he dispositive question is "whether the violative nature of particular conduct is clearly established." This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Such

---

[11] In Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed.2d 565 (2009), the Supreme Court modified the procedure mandated in Saucier permitting trial judges the discretion to determine which prong of the qualified immunity analysis should be resolved first. See Pearson, 555 U.S. at 236, 129 S. Ct. at 818.

> specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."

Mullenix, 136 S. Ct. at 308 (citations omitted) (emphasis and alteration in original).

Before the Court analyzes whether Officer Nobles violated a constitutional right by using excessive force, the Court must determine what force Officer Nobles actually used in arresting Wiley. According to Officer Nobles, he shot Wiley in the back with his Taser to terminate the foot chase, which caused Wiley's body to lockup mid-sprint, at which point Wiley fell face-down to the ground. Nobles Decl. at 6, ¶¶ 13-14; see also Scarpinati Decl. at 3 ¶ 3 (log of Officer Nobles's Taser activity reflecting that he deployed it once for five seconds). Nobles further testified that he then placed Wiley in handcuffs without further incident and without applying additional force. Id. at 6 ¶ 14. Wiley, however, implies that Officer Nobles must have used some unidentified force beyond merely a Taser. See TAC at 7.[12] Wiley does not describe in the TAC what other force Officer Nobles allegedly used, but he reasons that his injuries could not have resulted from being tased alone. Id. Wiley asserts that he suffered first, second, and third degree burns to his arms as a result of the use of force. Id. During his deposition, Wiley specified that he believes Officer Nobles shot him with a rifle. Wiley Depo. at 138-39. However, Wiley has no personal knowledge to support this claim, because as he admits, he has no recollection of what happened between the moment when he lost consciousness at the end of the foot chase and when he awoke later at Shands Hospital. Wiley Depo. at 70-72. Nor has Wiley produced any evidence or affidavits from any other sources to support the claim that Officer Nobles shot

---

[12] Because the TAC is a verified complaint, the Court treats it as an affidavit for summary judgment purposes. Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980).

him with a rifle or used any force beyond that described by Officer Nobles. While Wiley's description of the events differs from that of Officer Nobles, he fails to establish the existence of a genuine dispute of material fact.

On a summary judgment motion, the Court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves, 52 F.3d at 921 (11th Cir. 1995). That does not mean, however, that a court must accept the non-moving party's version of the facts if the record plainly contradicts it. Scott, 550 U.S. at 380; White v. Georgia, 380 F. App'x 796, 797 (11th Cir. 2010). Nor does that mean a court must draw unreasonable or implausible inferences in favor of the nonmoving party. Mize, 93 F.3d at 743 (quoting T.W. Elec. Servs., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)). "All reasonable inferences arising from the undisputed facts should be made in favor of the nonmovant, but an inference based on speculation and conjecture is not reasonable." Ave. CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287, 1294 (11th Cir. 2013) (quoting Blackston v. Shook and Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985)). Moreover, affidavits or testimony in support of or opposing summary judgment must be based on personal knowledge. See Rule 56(c)(4); Pace v. Capobianco, 283 F.3d 1275, 1278-79 (11th Cir. 2002).[13] As such, "an affidavit stating only that an affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact." Id. (citing Jameson v. Jameson, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge.") (remaining citations omitted).

---

[13]     In 2010, Rule 56 was reorganized such that Rule 56(e) became Rule 56(c)(4). Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1305 n.22 (11th Cir. 2011). However, the substance of the Rule did not change insofar as it required that a supporting or opposing affidavit be based on personal knowledge. See id.

First, the Court need not accept Wiley's version of the facts wherein he speculates that Officer Nobles must have shot him with a rifle. Notably, Wiley himself does not contend that he actually observed Officer Nobles fire the gun or that he, Wiley, suffered a gunshot wound. TAC at 7. Rather, he claims he suffered first, second, and third degree burns. Id. at 5. He only speculates that Officer Nobles shot at him. However, speculation or unsupported conclusory statements not based upon personal knowledge are insufficient to create a genuine issue of fact for purposes of a summary judgment motion. Ellis v. England, 432 F.3d 1321, 1327 (11th Cir. 2005); Pace, 283 F.3d at 1278-79 (emphasizing Rule 56's "personal knowledge" requirement and rejecting statements made merely on a person's "belief").

Wiley presents no evidence or testimony to support the inference that Officer Nobles fired a rifle at him. Moreover, the record affirmatively contradicts any inference that Wiley suffered a gunshot wound. The treatment notes from Shands Hospital give no indication whatsoever that Wiley suffered a gunshot wound. TAC Ex. at 4-8; Doc. 27-1. Instead, the treatment notes reflect that Wiley suffered lacerations, abrasions, a non-displaced jaw fracture, and other non-life threatening injuries from a Taser incident and resulting fall. Id.; Rao Decl. at 3 ¶ 4. Wiley's overall status was reported as "good," with no abnormalities in his vital signs being reported. TAC Ex. at 4-8. Dr. Rao avers in her affidavit that, after reviewing the photographs of Wiley's injuries and his medical record, he suffered non-life threatening injuries consistent with a fall or contact with a rough, hard surface. See Rao Decl. at 3 ¶ 4. The photographs of Wiley's injuries and the surface he fell onto corroborate Dr. Rao's opinion. Doc. 28-1 at 11-17; Nobles Decl. at 45. Dr. Rao's affidavit is also consistent with Officer Nobles's statement that when he shot Wiley in the back with

his Taser, Wiley's body locked up mid-stride, causing him to fall onto the asphalt surface and slide. Nobles Decl. at 6 ¶ 14. Indeed, even though Wiley claims Officer Nobles had a rifle, Wiley himself admits that he never saw Officer Nobles point the rifle at him. Wiley Depo. at 118, 140. Wiley offers no evidence conflicting with the medical records or Dr. Rao's opinions.

Second, the Court need not accept Wiley's version of the facts that he suffered first, second, or third degree burns on his arms. The record plainly contradicts such a claim. The hospital treatment notes offer no support for an inference that Wiley suffered any burns whatsoever. TAC Ex. at 4-8; Doc. 27-1. Instead, the hospital notes describe the injuries to Wiley's skin as lacerations and abrasions. Id. Additionally, Dr. Rao states that after reviewing the photographs and the records, "[t]here are absolutely no first, second, or third degree burns on the face or the extremities of Mr. Isiah Wiley." Rao Decl. at ¶ 4.g.

In sum, Wiley points to no evidence from which a reasonable juror could draw an inference that Officer Nobles used any force beyond the firing of the Taser on one occasion. The summary judgment standard does not require the Court to draw unreasonable inferences in favor of the nonmoving party, Mize, 93 F.3d at 743, and "an inference based on speculation and conjecture is not reasonable," Ave. CLO Fund, Ltd., 723 F.3d at 1294. Moreover, a nonmoving party must produce more than "a mere scintilla of evidence in support of the [their] position … to defeat a motion for summary judgment." Kesinger, 381 F.3d at 1247.[14] Wiley has not done this with respect to his assertion that

---

[14]    Wiley submitted hundreds of pages of exhibits in response to the Motion (see Doc. 33-1; Doc. 33-2; Doc. 33-3; Doc. 35; Doc. 35-1; Doc. 35-2), but provided hardly any citations to the materials in the Response. The Court reviewed the materials and determined that the majority were repetitive of exhibits already on file, indecipherable, or irrelevant. Moreover, the Court need not scour the record for evidentiary materials on file; instead, the Court need only ensure that the allegedly dispositive motion itself is supported by the appropriate evidentiary materials. Reese v.

Officer Nobles did more than tase him. Wiley admits that he lacks any personal recollection of what happened between when he lost consciousness and when he awoke at the hospital. Wiley Depo. at 70-72; see also TAC at 7. And Wiley has offered no evidence or testimony from any other source to fill in the gaps. Even treating the TAC as if it were equivalent to an affidavit, see Murrell, 615 F.2d at 310 n.5, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge," Fed. R. Civ. P. 56(c)(4), which Wiley admits he lacks. "[A]ffidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment." Ellis, 432 F.3d at 1327; Howard v. Memnon, 572 F. App'x 692, 694 (11th Cir. 2014). Accordingly, the Court rejects Wiley's suggestion that Officer Nobles must have shot him with a rifle.

Thus, there is no genuine factual dispute about the type of force used or Wiley's injuries. Officer Nobles's use of force consisted of tasing Wiley once in the back, which caused Wiley to fall and hit the ground before Officer Nobles placed him in handcuffs. Wiley's injuries consisted of lacerations and abrasions to his face, hands, and arms, as well as a non-displaced mandibular fracture.

Having determined there can be no genuine factual dispute about the force used, the Court now turns to the question of whether Officer Nobles's use of the Taser, under the circumstances here, was excessive under the Fourth Amendment. In assessing the reasonableness of Officer Nobles's use of his Taser, the Court must apply the Graham factors to the particular facts of this case. Based on the totality of the circumstances, the Court is of the view that Wiley has failed to point to facts creating a genuine issue for trial

_____

Herbert, 527 F.3d 1253, 1269 (11th Cir. 2008) (citing United States v. One Piece of Real Property Located at 5800  SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101-02 (11th Cir. 2004)).

on the question of the reasonableness of the force used by Officer Nobles. The undisputed material facts reflect that Wiley robbed a food mart, a witness reported that Wiley was armed, Wiley failed to follow Officer Nobles's repeated orders to get on the ground, and Wiley then fled Officer Nobles, such that Officer Nobles's use of his Taser was not unconstitutional.

The first Graham factor – the severity of the crime at issue – supports Officer Nobles's use of the Taser. 490 U.S. at 396; see also Crenshaw v. Lister, 556 F.3d 1283, 1292 (11th Cir. 2009) (officers' use of canine to apprehend suspect was justified, in part, by fact that arrestee was suspected of committing one, and possibly two, armed robberies). Significantly, the incident began right after Wiley robbed the Paradise Food Mart.[15] Robbery is not only a second-degree felony under Florida law, § 812.13(2)(c), Fla. Stat., but it is a crime that inherently involves the use or threatened use of violent physical force, United States v. Lockley, 632 F.3d 1238, 1245 (11th Cir. 2011); Magnotti v. State, 842 So. 2d 963, 965 (Fla. 4th DCA 2003). Thus, from the start, Officer Nobles knew he was dealing with a suspect capable of committing a crime of violence.

The second Graham factor, "whether the suspect poses an immediate threat to the safety of the officers or others," 490 U.S. at 396, also weighs in favor of Officer Nobles's use of the Taser. Making matters more fraught than they already were, a witness informed Officer Nobles that Wiley was armed with a knife. Nobles Decl. at 3 ¶ 7. Although Wiley did not in fact have a weapon, Officer Nobles could not have discovered this fact until after he had subdued Wiley. While Wiley was not armed, Officer Nobles's reasonable belief that he was armed is a factor that supports the use of force. See Crenshaw, 556 F.3d at 1292

_____

[15]     Wiley does not deny that he robbed the Paradise Food Mart. Wiley Depo. at 67. Wiley pled guilty to the robbery and was convicted of the offense in state court. Id. at 188-94.

(officer's reasonable belief that robbery suspect was armed supported use of canine to apprehend suspect). Given that Wiley had not only committed a robbery, but that he was reportedly armed with a knife, Officer Nobles had ample reason to fear that Wiley might turn the knife on him or someone else to evade apprehension. Moreover, Wiley was running past two open businesses and toward a residential area when Officer Nobles fired his Taser. Nobles Decl. at 6-7 ¶ 12. Thus, based on the undisputed facts, Officer Nobles not only had reason to fear that Wiley could pose a danger to him, but that Wiley could also pose a threat to others as well.

The third Graham factor, "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, also weighs in favor of Officer Nobles's use of the Taser. It is undisputed that after Wiley robbed Paradise Food Mart, he left the store and went to a dark alleyway behind a closed drive-through restaurant. Nobles Decl. at 4, ¶¶ 9-10; Wiley Depo. at 67-69. When Officer Nobles tracked Wiley down in the alleyway, Wiley disobeyed repeated commands to get down on the ground. Nobles Decl. at 4-5, ¶¶ 10-11; Wiley Depo. at 68, 100. Then, after Officer Nobles gave his third or fourth command for Wiley to get down, Wiley took off running, forcing Officer Nobles to chase him on foot. Nobles Decl. at 5, ¶¶ 11-12; Wiley Depo. at 69, 103-04. While Wiley states he was not certain whether Officer Nobles was a police officer, he admits that Officer Nobles was wearing his police uniform at the time, and Wiley continued running even after seeing Officer Nobles in his uniform. See Wiley Depo. at 114-15. As the Supreme Court explained, "[t]he attempt to elude capture is a direct challenge to an officer's authority" and "gives the officer reason to believe that the [suspect] has something more serious … to hide." Sykes v. United States, 564 U.S. 1, 9 (2011), overruled on other grounds, Johnson v. United

22

States, 135 S. Ct. 2551 (2015). For this reason, a police officer must be prepared to use force to arrest a fleeing suspect because "[c]onfrontation with [the] police is the expected result" of such flight. See id. at 10.

As such, all three Graham factors – the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is attempting to resist arrest or evade capture by flight – weigh in Officer Nobles's favor. The Court does not end its inquiry there, however. The Eleventh Circuit also instructs district courts to consider three other factors: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Lee, 284 F.3d at 1197-98. The Court refers to these as "the Lee factors."

The first Lee factor – the need for the application of force – is answered by the Graham factors themselves. The fact that Wiley had reportedly committed a serious felony, that Officer Nobles reasonably believed Wiley to be armed and dangerous, and that Wiley was actively resisting arrest by fleeing from Officer Nobles, all suggest that the need to use force was great. In particular, the fact that Wiley disobeyed several commands to get on the ground and fled Officer Nobles demonstrates that Wiley was not going to voluntarily surrender, such that force was necessary to stop him.

The second Lee factor – the relationship between the need and the amount of force used – is perhaps the central question, and it especially weighs in favor of a conclusion that Officer Nobles's use of the Taser was not excessive. As noted, Officer Nobles reasonably believed that Wiley was armed with a knife and that Wiley had just committed the felony crime of robbery. When Officer Nobles encountered Wiley, Officer Nobles was by himself in a darkened alley behind a shuttered business. Making matters more

23

complicated for Officer Nobles, he was unable to call for backup because his radio was not transmitting. Nobles Decl. at 4-5 ¶ 10.[16] Thus, when Wiley took off running, Officer Nobles found himself chasing a reportedly armed suspect, alone, in the dark of night. Right before Officer Nobles fired his Taser, Wiley was about to turn the corner in front of a business and head down another alleyway that led toward a residential neighborhood. Nobles Decl. at 5-6 ¶ 12, 14; Doc. 28-1 at 10. To prevent Wiley's escape into the neighborhood, and to protect himself, Officer Nobles deployed his Taser once for five seconds. Nobles Decl. at 6, ¶13, 8, ¶ 21; Scarpinati Decl. at 3 ¶ 3. Under these circumstances, Officer Nobles's brief use of the Taser was undoubtedly reasonable. Officer Nobles was faced with a tense, chaotic, potentially dangerous, and fluid situation. Wiley was obviously unwilling to surrender voluntarily. To prevent the escape of a potentially armed suspect, Officer Nobles fired his Taser once at Wiley's back, allowing it to cycle briefly. Officer Nobles used a nonlethal amount of force designed to incapacitate, not kill, the suspect. See Buckley, 292 F. App'x at 796 (characterizing officer's use of Taser as a moderate, non-lethal amount of force). There is no genuine dispute that a reasonable policeman in Officer Nobles's position could have believed that Wiley posed a threat and that deploying his Taser in such a manner was a proportionate response.

---

[16]    In his Response, Wiley contends that the Response to Resistance Report (which is attached to Officer Nobles's Declaration) shows that Officer Nobles's radio was working. Response at 2; Nobles Decl. at 12. In the Response to Resistance Report, Officer Nobles states that right after he located Wiley, he "quickly circled the store in my unmarked vehicle and alerted HQ via my car radio that I had possibly located the suspect." Nobles Decl. at 12. Contrary to Wiley's assertion, this statement does not refute the part of Officer Nobles's affidavit that his radio was not transmitting when he attempted to call for backup. See Nobles Decl. at 4 ¶ 10. The report only suggests that Officer Nobles sent an alert to headquarters that he had located Wiley, not that the alert was ultimately transmitted. Moreover, the report only relates to Officer Nobles's use of the radio upon locating Wiley. The report does not bear on the working condition of the radio at the time Officer Nobles had disembarked his vehicle, was confronting Wiley, and was trying to call for backup. Thus, the report does not refute Officer Nobles's statement in his affidavit that his radio was failing to transmit when he tried calling for backup.

In the Eleventh Circuit, "noncompliance or continued physical resistance to arrest justifies" the use of a Taser, <u>Barfield v. Rambosk</u>, 641 F. App'x 845, 848 (11th Cir. 2015), even when the suspect is unarmed, <u>Smith v. LePage</u>, 834 F.3d 1285, 1295 (11th Cir. 2016). In fact, "'where a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer.'" <u>Id.</u> at 1294 (citations omitted); <u>see also</u> <u>Zivojinovich v. Barner</u>, 525 F.3d 1059, 1073 (11th Cir. 2008) (finding that officers reasonably tased a handcuffed detainee who violently resisted arrest and continued to struggle); <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1278 (11th Cir. 2004) (permitting an officer to deploy his Taser against an unarmed and non-violent arrestee who failed to follow reasonable instructions). Officer Nobles's brief, nonlethal use of the Taser was well tailored to the circumstances, and as a result Officer Nobles apprehended a potentially dangerous suspect.

The third <u>Lee</u> factor – the extent of the injury inflicted – does not weigh in favor of either side. Wiley's injuries mainly consisted of a laceration to his chin, abrasions to his face, hands, and arms, and a non-displaced jaw fracture. Rao Decl. at 3 ¶ 4; TAC Ex. at 4-8. These injuries are not trivial by any means, but they are not especially severe either. It is worth noting too that most of Wiley's injuries did not result from the direct application of force by Officer Nobles.[17] Rather, they resulted indirectly because when Officer Nobles tased Wiley, the shock caused Wiley's body to lock up mid-stride and fall face-down onto a surface that was hard and pebbly. Nobles Decl. at 6, ¶ 14; Rao Decl. at 3 ¶ 4. Moreover, regardless of how serious one considers Wiley's injuries to be, they were the result of

---

[17]    Indeed, Wiley admits that he has no knowledge of Officer Nobles kicking, punching, or otherwise striking him. Wiley Depo. at 144-45. Likewise, Officer Nobles denies that he kicked, punched, or otherwise struck Wiley after tasing and handcuffing him. Nobles Decl. at 7 ¶¶ 16, 18.

Officer Nobles's proportionate use of force against a fleeing, potentially dangerous suspect.

Therefore, based on the specific facts of this case, the Court finds that Officer Nobles's use of his Taser was not constitutionally excessive. In light of the underlying robbery, the fact that a witness told Officer Nobles that Wiley was armed with a knife, the late hour and poor lighting, the fact that Officer Nobles was by himself, and most importantly, Wiley's flight from Officer Nobles after disobeying several commands, Officer Nobles reasonably believed he was in a high risk situation. A reasonable policeman in Officer Nobles's shoes could have believed that using his Taser was appropriate. Indeed, the facts of this case are even more favorable to Officer Nobles than those in Draper, 369 F.3d at 1272-74. There an officer deployed his taser against a truck driver who repeatedly failed to comply with the officer's orders following a traffic stop over a taillight. Id. at 1273-74. Although the driver was disobeying the officer's commands and behaving belligerently, the driver was not suspected of committing a violent felony, was not believed to be armed, and was not fleeing from the officer. Nonetheless, the Eleventh Circuit held that the officer's "use of the taser gun to effectuate the arrest . . . was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop, and did not constitute excessive force." Id. at 1278. Here by comparison, Officer Nobles's use of the Taser surely did not infringe Wiley's Fourth Amendment rights. Accordingly, the Court determines that Wiley has failed to create a genuine issue of fact on his claim that Officer Nobles used excessive force and as such Officer Nobles is entitled to summary judgment on Wiley's Fourth Amendment excessive force claim.[18]

---

[18]    The Court need not consider the issue of qualified immunity because it has determined there was no constitutional violation. However, if the Court did address the issue, it would find that

26

### B. Wiley's State Law Claims

In the remaining counts of the TAC, Wiley seeks relief from Officer Nobles based on various state law theories, including negligence, battery, and intentional infliction of emotional distress. "The decision to exercise supplemental jurisdiction over pend[e]nt state claims rests within the discretion of the district court." Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004). Pursuant to 28 U.S.C. § 1367(c), the Court may decline to exercise jurisdiction over a state claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Notably, "[a]ny one of the section 1367(c) factors is sufficient to give the district court discretion to dismiss a case's supplemental state law claims." Parker v. Scrap Metal Processors, Inc., 468 F.3d 733, 743 (11th Cir. 2006). However, upon determining that it has the discretion under § 1367(c) to decline jurisdiction, "[a district court] should consider the traditional rationales for pendent jurisdiction, including judicial economy and convenience in deciding whether or not to exercise that jurisdiction." Palmer v. Hosp. Auth. of Randolph Cnty., 22 F.3d 1559, 1569 (11th Cir. 1994). Upon due

---

Officer Nobles is entitled to qualified immunity for the same reason. See Garczynski v. Bradshaw, 573 F.3d 1158, 1170 (11th Cir. 2009) ("No constitutional violation occurred. Without this element, we need not assess whether the alleged violation was clearly established…. Accordingly, the district court correctly afforded the officers qualified immunity and granted them summary judgment as to the § 1983 claims of excessive and deadly force.") (internal citation omitted).

consideration, the Court finds that judicial economy and convenience would not be served by retaining jurisdiction over Wiley's state law claims. Thus, the Court declines to exercise its supplemental jurisdiction over these claims.

For the reasons set forth above, the Court has determined that Officer Nobles's Motion is due to be granted in regard to the only claim in the TAC over which the Court has original jurisdiction – the Fourth Amendment excessive force claim. What remains are uniquely state law claims that are best addressed by the state courts. Indeed, the Eleventh Circuit has indicated that a district court may properly decline to exercise jurisdiction over supplemental state law claims when the federal claims over which the Court had original jurisdiction are dismissed on a motion for summary judgment, as is the case here. See Hicks v. Moore, 422 F.3d 1246, 1254-55, 1255 n.8 (11th Cir. 2005) (after granting summary judgment on all federal claims in favor of the defendant, the Eleventh Circuit noted the district court's discretion in whether to remand the plaintiff's supplemental state law claims); Murphy v. Fla. Keys Elec. Co-op Ass'n, Inc., 329 F.3d 1311, 1320 (11th Cir. 2003) (affirming summary judgment on defendant's contribution claim invoking admiralty jurisdiction, and affirming dismissal of third-party defendant's state law counterclaim under 28 U.S.C. § 1367(c)); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (affirming and attaching as appendix district court decision which stated: "If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."); Eubanks v. Gerwen, 40 F.3d 1157, 1162 (11th Cir. 1994) (stating that since the "federal claims [had] been disposed of rather early on at the summary judgment phase[,] . . . comity suggests that the remaining state law malicious prosecution claim should be heard in state court");

see also <u>Maschmeier v. Scott</u>, 508 F. Supp. 2d 1180, 1185-86 (M.D. Fla. 2007) (declining to exercise supplemental jurisdiction over the plaintiff's state law claim after granting summary judgment in favor of the defendant on the plaintiff's federal claims).

In deciding whether to exercise supplemental jurisdiction over state law claims, district courts consider "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims," as well as "the values of judicial economy, convenience, fairness, and comity." <u>City of Chicago v. Int'l Coll. of Surgeons</u>, 522 U.S. 156, 173 (1997) (internal quotations omitted) (citing <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 (1988)). However, "[w]hen the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." <u>Cohill</u>, 484 U.S. at 350 (citing <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726-27 (1966)) (footnote omitted); <u>Gibbs</u>, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); <u>see also</u> <u>Raney</u>, 370 F.3d at 1089 (stating that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial") (citing <u>L.A. Draper & Son v. Wheelabrator-Frye, Inc.</u>, 735 F.2d 414, 428 (11th Cir. 1984)).

Notably, the Supreme Court's directive in <u>Cohill</u> concerning when a district court should decline to continue to exercise supplemental jurisdiction "was not intended to 'establish a mandatory rule to be applied inflexibly in all cases,'" but "it did establish a

general rule to be applied in all but extraordinary cases." <u>Carr v. Tatangelo</u>, 156 F. Supp. 2d 1369, 1380 (M.D. Ga. 2001) (citing <u>Cohill</u>, 484 U.S. at 350 n.7). Moreover, because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed before trial. <u>Baggett v. First Nat'l Bank of Gainesville</u>, 117 F.3d 1342, 1353 (11th Cir. 1997). Here, the Court has determined that summary judgment in favor of Officer Nobles is proper with regard to Wiley's federal claim. Because the lone federal claim has been dismissed before trial, the Court, in its exercise of discretion under § 1367(c), declines to retain jurisdiction over Wiley's remaining state law claims. <u>See</u> <u>Hicks</u>, 422 F.3d at 1255 n.8. Accordingly, the remaining counts of the TAC are due to be dismissed without prejudice to refiling in the appropriate state court.[19]

## V.    Conclusion

In accordance with the foregoing, it is hereby **ORDERED**:

1. Officer Nobles's Motion for Final Summary Judgment (Doc. 24) is **GRANTED IN PART** and **DENIED IN PART**.

---

[19]    The Court notes that Wiley will suffer no harm from the Court's decision to decline supplemental jurisdiction because federal law provides for the tolling of the state limitations period while a state claim is pending in federal court and for thirty days thereafter. Specifically, 28 U.S.C. § 1367(d) provides that:

> [t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

As such, the state limitations period has been held in abeyance during the pendency of these proceedings. <u>See</u> <u>Artis v. District of Columbia</u>, 138 S. Ct. 594, 598 (2018) (holding that "§ 1367(d)'s instruction to 'toll' a state limitations period means to hold it in abeyance, <u>i.e.</u>, to stop the clock").

2. The Motion is granted with respect to Wiley's Fourth Amendment excessive force claim. The Clerk shall enter judgment in favor of Defendant Officer J.C. Nobles and against Plaintiff Isiah Wiley as to this claim.

3. The Motion is denied as to the remaining claims in the Third Amended Complaint, which are **DISMISSED WITHOUT PREJUDICE**. In the exercise of its discretion under 28 U.S.C. § 1367(c), the Court declines to continue to exercise jurisdiction over these claims.

4. The Clerk of the Court is directed to terminate all remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on August 30, 2018.

MARCIA MORALES HOWARD
United States District Judge

Lc 19

Copies:

Counsel of record
Pro se plaintiff